UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

KIANA ALVARADO, LIANA ARIAS, SHAKIERRA
GRIFFIN, OSCAR RIVERA, MINAYA RIVERA,
JENNIFER HENRY, BILAL MCCLURE, SHANTA
STEVENS, JADE WILLIAMS, and LASHAY FULLER,

                              Plaintiffs,

                    -v-

SWEETGREEN, INC., DONALD IZQUIERDO, and
EDWIN VENTURA,

                              Defendant.
------------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  1/17/2024
```

23-cv-8948 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants Sweetgreen, Inc. ("Sweetgreen"), Donald Izquierdo, and Eduwin Ventura

(collectively, "Defendants") move to compel arbitration, pursuant to the Federal Arbitration Act

("FAA"), 9 U.S.C. § 1, *et seq.*, and to dismiss the amended complaint, Dkt. No. 1-1 ("Amended

Complaint"), pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. No. 5.  Plaintiffs Kiana

Alvarado, Liana Arias, Shakierra Griffin, Oscar Rivera, Minaya Rivera, Jennifer Henry, Bilal

McClure, Shanta Stevens, Jade Williams, and Lashay Fuller (collectively, "Plaintiffs") move to

remand this action to the Supreme Court of the State of New York, Bronx County.[1]  Dkt. No. 13.

---

[1] As explained *infra*, McClure and Stevens subsequently filed a stipulation to arbitrate and
dismiss their claims.  Dkt. No. 15.  However, as both parties recognize, McClure and Stevens
remain relevant to the Court's removability analysis.  *See Audi of Smithtown, Inc. v. Volkswagen
of Am., Inc.*, 2009 WL 385541, at *3 (E.D.N.Y. Feb. 11, 2009) (Bianco, J.) ("[D]iversity
jurisdiction is determined at the time of removal." (citing *Grupo Dataflux v. Atlas Glob. Grp.,
L.P.*, 541 U.S. 567, 570–71 (2004)).

## BACKGROUND

The Court accepts the well-pleaded allegations of the Amended Complaint as true for purposes of these motions. *See, e.g.*, *Rosa v. Mandarich L. Grp., LLP*, 2023 WL 4561830, at *1 (S.D.N.Y. July 17, 2023).

Sweetgreen owns and operates a national chain of approximately 180 restaurants that offer handmade ready-to-eat salads. Dkt. No. 1-1 ¶ 14. Among other locations, it has stores in New York City at 55th Street and Park Avenue ("55th Street"), 32 Gansevoort Street ("Meatpacking"), 38th Street and Broadway ("38th Street"), and Wall Street ("Wall Street"). *Id.* Izquierdo has been the general manager (or "Head Coach") at the 55th Street location from approximately 2017 to present. *Id.* ¶ 16. Ventura was general manager (or Head Coach) of the Wall Street location from approximately 2019 through approximately December 2021. *Id.* ¶ 20.

Plaintiffs are ten current and/or former employees of Sweetgreen. *Id.* ¶¶ 23, 45, 55, 68, 70, 87, 89, 117, 147, 149, 173, 200, 240, 242. Alvarado was employed at the 55th Street location from August 23, 2019 to February 2021 and at the Meatpacking location from February 2021 to early February 2022. *Id.* ¶¶ 24–25, 29. Arias was employed at the 55th Street location from in or around early 2017 through July 30, 2019. *Id.* ¶ 45. Oscar Rivera and Minaya Rivera were employed at the Meatpacking location beginning in or around October 15, 2021; Sweetgreen terminated Oscar Rivera's employment on or around January 5, 2022, and Minaya Rivera's employment on or around November 1, 2022. *Id.* ¶¶ 55, 68, 70, 87. Henry worked for Sweetgreen from December 26, 2019 until she was furloughed due to the COVID-19 pandemic in or around April 2020, and began working again starting in October 2020. *Id.* ¶¶ 89–91. During the course of Henry's employment, she worked at the Wall Street location, the 38th Street location, and the 55th Street location. *Id.* ¶¶ 91–92, 97. Griffin worked for Sweetgreen from June 2019 to January 2023. *Id.* ¶¶ 117, 147. After being trained in Brooklyn, she was assigned

to the 55th Street and Meatpacking locations. *Id.* ¶¶ 117–18, 126.  McClure began working for Sweetgreen on or around July 19, 2019. *Id.* ¶ 149.  He worked at the Wall Street location. *Id.* ¶ 150.  Stevens began working for Sweetgreen at its Wall Street location in or around June 2020, and continued working at that location until in or around July 2022. *Id.* ¶¶ 173, 187.  Williams worked for Sweetgreen at its Wall Street location beginning in or around January 2020 and continued at that location until in or around May 2021, after which he was transferred to Sweetgreen's 12th Street and University Place location ("12th Street"); Williams was terminated from Sweetgreen on or around July 9, 2023. *Id.* ¶¶ 200, 220, 240.  Fuller was employed by Sweetgreen at its Wall Street location from in or around 2019 to early 2021. *Id.* ¶¶ 242, 269.

Plaintiffs—all of whom are African American, *id.* ¶¶ 4–13—complain of discrimination on the basis of race and gender and the hostile work environment that they allegedly experienced at several Sweetgreen locations in Manhattan:

When Alvarado's coworker at the 55th Street location made a sexually inappropriate comment to her in Spanish, Alvarado complained to Izquierdo, but he did not reprimand the coworker or take any action against him. *Id.* ¶ 26.  The coworker continued to make lewd remarks about Alvarado and female coworkers and customers, including in front of Izquierdo, and did so with impunity. *Id.* ¶¶ 27–28.  Alvarado transferred to the Meatpacking location; however, the Hispanic employees there used racist slurs, such as the "n-word," on a daily basis to describe Black employees and Black customers alike. *Id.* ¶¶ 29–34.  Alvarado's complaints to the Meatpacking Head Coach, Oscar Ferero, fell on deaf ears, as he refused to discipline the employees who made those racist remarks. *Id.* ¶ 36.  Ferero also favored the location's Hispanic employees by giving them more hours than the Black workers. *Id.* ¶ 38.  He was particularly fond of one of the employees who regularly used the n-word, and on one occasion Alvarado

witnessed that employee dancing in front of Ferero in a sexually inappropriate manner.  *Id.* ¶ 40. Although Alvarado's female coworker complained to Sweetgreen's human resources department ("People Support") about an inappropriate comment Ferero had made, People Support did not take any action against him.  *Id.* ¶ 41.

While Arias worked at the 55th Street location, she saw that Head Coach Izquierdo favored Hispanic employees over Black employees.  He promoted Hispanic employees over equally- or more-qualified Black workers, assigned desirable tasks to Hispanic workers instead of Black workers, and permitted Hispanic workers but not Black workers to end their shifts early with full pay.  *Id.* ¶ 47.  Arias also witnessed Hispanic workers at the 55th Street location make derogatory comments about the restaurant's Black employees on a daily basis.  *Id.* ¶¶ 49–50. Izquierdo overheard some of these remarks, yet he laughed at or ignored them without taking any disciplinary action.  *Id.* ¶ 51.  Additionally, Izquierdo made racially insensitive comments about the natural texture of Arias's hair, *id.* ¶ 52, and sexually inappropriate remarks about female customers in the presence of Arias and other employees, *id.* ¶ 53.

At the Meatpacking location, Minaya Rivera and Oscar Rivera both overhead Hispanic employees make racist remarks about Black employees and customers.  *Id.* ¶¶ 62–66, 73–79. Minaya Rivera also experienced sexually inappropriate behavior: she saw a coworker lewdly dancing in front of Ferero, *id.* ¶ 82, and she heard Ferero discussing which females he found attractive, *id.* ¶ 85.  Ferero's behavior made Minaya Rivera uncomfortable, as she knew that a fellow coworker had lodged a sexual-harassment complaint against Ferero with People Support. *Id.* ¶¶ 84–85.  Oscar Rivera was deprived of his pay when the code he used to clock into work was non-functioning for fifteen days.  *Id.* ¶ 59.  Although Oscar Rivera notified his managers of this issue, Sweetgreen failed to pay him for his work during that time.  *Id.* ¶ 61.

Henry was a third-level supervisor who trained to become an assistant manager ("Assistant Coach") at the Wall Street location under the supervision of Head Coach Ventura. *Id.* ¶ 91.  Henry subsequently transferred to the 38th Street restaurant, where she heard her Hispanic coworkers use the n-word on a daily basis.  *Id.* ¶ 93–95.  The restaurant's Head Coach was aware of, and in some cases present for, that racist language, but he did not take any action to prevent it or discipline the responsible employees.  *Id.* ¶ 96.  After completing her Assistant Coach training, Henry switched to the 55th Street location, where Izquierdo was Head Coach.  *Id.* ¶ 97.  Henry observed Izquierdo regularly make suggestive comments about female customers. *Id.* ¶¶ 99–100.  Izquierdo also touched Henry and other female employees on their shoulders and the small of the back when speaking with them.  *Id.* ¶ 101.  Izquierdo favored a Hispanic supervisor named Betsy, with whom Henry believed he had a sexual relationship, by delegating Henry's managerial responsibilities to Betsy even though Henry was her superior.  *Id.* ¶¶ 102, 106–108.  Henry complained to Izquierdo, the Area Leader Christian Ferreira, and Sweetgreen's People Support that Izquierdo's actions had undermined her authority, but Izquierdo, Ferreira, and People Support all ignored her concerns.  *Id.* ¶¶ 110–112.

Griffin similarly worked under Izquierdo's supervision at the 55th Street location.  *Id.* ¶ 118.  Izquierdo passed Griffin over for a promotion to Shift Leader, choosing the partially Hispanic Alvarado even though Griffin was more qualified.  *Id.* ¶ 121.  He also permitted Betsy to discipline Griffin and other Black employees for actions that Hispanic employees took without any repercussions.  *Id.* ¶¶ 122–124.  Griffin found the environment so intolerable that she quit Sweetgreen in mid-January 2020.  *Id.* ¶ 125.  However, she rejoined in June 2021 to work at Sweetgreen's Meatpacking location, which Griffin had heard was a better working environment. *Id.* ¶ 126.  A few months after Griffin joined the Meatpacking location, Ferero became its Head

Coach. *Id.* ¶ 128. Once he did, the Meatpacking location's Hispanic employees began to use racist and derogatory language to describe Black coworkers and customers. *Id.* ¶¶ 130–135. Griffin repeatedly complained about those remarks to Ferero, but he failed to take any action to address the issue. *Id.* ¶¶ 138–139. Additionally, Griffin observed two coworkers dancing in a sexually inappropriate manner in front of Ferero, as he laughed and danced along. *Id.* ¶ 143. Ferero often inappropriately touched Griffin and other female employees when speaking with them. *Id.* ¶ 145.

McClure was an assistant manager (or "Assistant Coach") at the Wall Street location, where she reported to Ventura. *Id.* ¶ 153. Ventura permitted the restaurant's Hispanic employees to use the n-word freely, and Ventura himself used the slur on a daily basis—including to refer to McClure and her Black coworkers. *Id.* ¶¶ 154–56. On one occasion, when McClure had a heated discussion with a coworker, a Hispanic team member put his hand on McClure's face and in a threatening tone told her that someone would "f[***] [her] up" someday because she "need[ed] to get f[***]ed up." *Id.* ¶ 162. McClure told Ventura about the incident, but he shrugged it off without disciplining the employee who had intimated her. *Id.* Ventura also paid a white employee more than a Black employee despite the Black employee's greater experience. *Id.* ¶ 164. Ventura explained that discrepancy to McClure by stating that customers wanted to see a white person at the register. *Id.* ¶ 165. He repeatedly declined to hire Black job applicants and said that he disliked hiring people who were Black because they "were too aggressive." *Id.* ¶¶ 166–167. On approximately three occasions, McClure told the Sweetgreen Area Leader, Tara Finchum, that Ventura had discriminated against Black employees, but Sweetgreen failed to take any action in response and the inappropriate behavior continued unabated. *Id.* ¶¶ 168–170.

Like McClure, Stevens worked at the Wall Street restaurant, where she served as a Shift Manager and was subjected to her Hispanic coworkers' daily use of the n-word. *Id.* ¶¶ 173–174. Stevens voiced her discomfort with her coworkers' racist remarks to Ventura, but he refused to reprimand them. *Id.* ¶¶ 176–177. Ventura also repeatedly passed Stevens over for promotions, opting to instead elevate less-qualified Hispanic employees. *Id.* ¶¶ 178–181. Stevens observed that Ventura assigned all of the location's Black workers to the less desirable night shift, while allowing Hispanic employees to work the more desirable daytime shift. *Id.* ¶¶ 183–184.

Williams experienced similar mistreatment at the Wall Street location. Ventura and other Hispanic workers used the n-word to refer to Williams and other Black employees. *Id.* ¶¶ 202–205. Ventura made other racist remarks regarding Black employees. *Id.* ¶¶ 206–207. And he promoted Hispanic workers instead of Williams, even when Williams was the higher-performing and more qualified candidate. *Id.* ¶¶ 208–210. Williams heard Ventura make sexually inappropriate comments about female employees and customers approximately every other day. *Id.* ¶¶ 213–218. Williams transferred to the 12th Street location, yet she continued to experience discrimination. Her coworkers there also regularly used the n-word and other slurs. *Id.* ¶¶ 223–224, 226. Williams informed her Head Coach about the racist language her coworkers' had used, but the Head Coach merely expressed sympathy. Indeed, the Head Coach favored Hispanic workers by failing to discipline them and promoting them ahead of Black workers. *Id.* ¶ 229. At one point, Sweetgreen Area Leader Robert Coppola visited the 12th Street restaurant. *Id.* ¶ 233. When he saw Williams wearing a head-wrap to cover her natural hair, Coppola reprimanded her and told he she was not permitted to wear head coverings to work, even though Coppola and Sweetgreen permitted Hispanic employees to wear similar head coverings. *Id.*. Ultimately, Williams transferred to Sweetgreen's 75th Street and Amsterdam Avenue ("75th

Street") location.  *Id.* ¶ 234.  Yet she once again found that Hispanic employees received better treatment than their Black coworkers.  For example, when Williams complained to her Head Coach that a Hispanic coworker had used abusive language to Black employees and ignored instructions from Black managers, *id.* ¶ 237, the Head Coach told Williams not to report the coworker to People Support, *id.* ¶¶ 238–239.

Finally, Fuller experienced race and gender discrimination at the Wall Street location. She heard Ventura use the n-word approximately twice per week, to refer to both Fuller and her Black coworkers.  *Id.* ¶¶ 244–245.  Ventura also tolerated other Hispanic employees' use of the n-word.  *Id.* ¶ 250.  Although Fuller told Ventura on multiple occasions that she found the use of that word unacceptable, Ventura did not discipline the offending employees and they continued to use the n-word regularly, including in front of Ventura.  *Id.* ¶ 252.  He also promoted Hispanic employees who used the n-word over Fuller, despite their extensive records of absenteeism.  *Id.* ¶¶ 253–254.  Likewise, Ventura rejected Black job applicants in favor of Hispanic ones and justified his decisions by resorting to racial stereotypes.  *Id.* ¶ 258.  Ventura made sexually inappropriate remarks to Fuller, *id.* ¶ 259, and touched her on the small of the back when speaking with her.  *Id.* ¶¶ 260–262.  After enduring Ventura's comments and touching for approximately six months, Fuller told him to stop and that his actions had made her deeply unconformable.  *Id.* ¶ 264.  Ventura stopped his inappropriate behavior towards Fuller, but continued to touch Fuller's female coworkers and make sexual remarks about female customers and employees.  *Id.* ¶ 266.

## PROCEDURAL HISTORY

On March 13, 2023, Alvarado and Arias initiated this action by complaint (the "Complaint") filed against Sweetgreen and Izquierdo in New York State Supreme Court, Bronx County.  Dkt. No. 1 ¶ 12.  The Complaint alleged claims of discrimination and hostile work

environment based on gender and race under the New York City Human Rights Law
("NYCHRL"), N.Y.C. Admin. Code § 8-107, *et seq.*  Dkt. No. 1-2.  The Complaint was served
on Izquierdo in person on June 15, 2023.  Dkt. No. 1 ¶ 13.  It was served on Sweetgreen on June
20, 2023, via Sweetgreen's designated process server.  *Id.*  The Complaint alleges that Izquierdo,
Alvarado, and Arias are all residents of the State of New York.  Dkt. No. 1-2 ¶¶ 4, 5, 7.

On September 14, 2023, Plaintiffs filed an Amended Complaint in New York State
Supreme Court, joining Oscar Rivera, Minaya Rivera, Henry, McClure, Stevens, Williams, and
Fuller as additional Plaintiffs and Ventura as an additional defendant.  Dkt. No. 1 ¶ 3.  Like the
Complaint, the Amended Complaint alleges claims of discrimination and hostile work
environment on the basis of gender and race in violation of the NYCHRL.  Dkt. No. 1-1.
However, the Amended Complaint also includes a minimum-wage claim under the New York
Labor Law ("NYLL"), based on Sweetgreen's failure to pay Oscar Rivera.  *Id.* ¶¶ 290–295.

On October 11, 2023, Defendants removed the action to this Court based on the parties'
purported diversity of citizenship.  Dkt. No. 1.  A little over a week later, on October 20, 2023,
Defendants moved to compel arbitration.  Dkt. No. 5.  Defendants also filed a declaration and a
memorandum of law in support of that motion.  Dkt. Nos. 6–7.  Plaintiffs filed a memorandum of
law and two declarations in opposition to the motion to compel arbitration.  Dkt. Nos. 18–20.
Defendants filed a reply memorandum and two additional declarations in support of the motion.
Dkt. Nos. 21–24.

On November 13, 2023, Plaintiffs filed a motion to remand to state court and a
memorandum of law in support of the motion.  Dkt. Nos. 13–14.  That same day, Defendants and
McClure and Stevens filed a stipulation to arbitrate and to dismiss the claims of McClure and
Stevens.  Dkt. No. 15.  Defendants filed a memorandum of law opposing the motion to remand

on December 15, 2023.  Dkt. No. 25.  Plaintiffs filed a reply memorandum and accompanying

affirmation on January 5, 2024.  Dkt. Nos. 26–27.

## DISCUSSION

Because Plaintiffs' motion to remand contends that the Court lacks subject matter

jurisdiction, Dkt. No. 14 at 6, the Court addresses that motion first, *see 3F Partners Ltd. P'ship*

*v. Medtronic, Inc.*, 2018 WL 5266876, at *2 (S.D.N.Y. Oct. 23, 2018) ("The Court begins, as it

must, with the issue of subject-matter jurisdiction.").

The federal removal statute allows a defendant to remove to federal court "any civil

action brought in a State court of which the district courts of the United States have original

jurisdiction."  28 U.S.C. § 1441(a).  However, a motion to remand for lack of subject matter

jurisdiction may be brought at any time while the action is pending in federal court, pursuant to

28 U.S.C. § 1447(c).  The party who removed the action from state court to federal court bears

the burden of proving federal jurisdiction.  *See Cal. Pub. Emps. Ret. Sys. v. WorldCom. Inc.*, 368

F.3d 86, 100 (2d Cir. 2004); *accord United Food & Com. Workers Union, Loc. 919 v.*

*CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994).  As a general matter,

"there is a presumption against removal, and uncertainties tend to weigh in favor of remand."

*Harraz v. EgyptAir Airlines Co.*, 2019 WL 6700946, at *2 (S.D.N.Y. Dec. 9, 2019).  "[O]ut of

respect for the limited jurisdiction of the federal courts and the rights of states, we must resolve

any doubts against removability."  *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 488 F.3d

112, 124 (2d Cir. 2007) (internal quotation marks omitted).

Defendants argue removal was appropriate because this Court has both federal question

and diversity jurisdiction.  Dkt. No. 25 at 4–5.  Plaintiffs respond that neither applies, such that

the Court must remand the case to the New York State Supreme Court.  Dkt. No. 27 at 1–3.  The

Court examines federal question jurisdiction first, and then addresses diversity jurisdiction.

According to Defendants, this Court has federal question jurisdiction pursuant to the

Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), 9 U.S.C.

§ 402, because Plaintiffs raised that statute in opposing Defendants' motion to compel

arbitration, Dkt. No. 25 at 4; *see also* Dkt. No. 24 at 2 ("Given that Griffin purports to raise the

EFAA as a bar to Defendants' motion to compel arbitration of the remaining Plaintiffs, this

Court has jurisdiction.").  "The presence or absence of federal question jurisdiction is governed

by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a

federal question is presented on the face of the plaintiff's properly pleaded complaint." *Riverbay*

*Corp. v. Serv. Emps. Int'l Union, Loc. 32BJ*, 2023 WL 2136423, at *2 (S.D.N.Y. Feb. 21, 2023)

(quoting *Shapnik v. Hebrew Home for the Aged at Riverdale*, 535 F. Supp. 3d 301, 310

(S.D.N.Y. 2021)); *see Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  A blackletter

corollary of that rule is that federal question jurisdiction cannot rest on "a federal

defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties

concede that the federal defense is the only question truly at issue."[2]  *State ex rel. Tong v. Exxon*

*Mobil Corp.*, 83 F.4th 122, 132 (2d Cir. 2023) (quoting *Caterpillar Inc.*, 482 U.S. at 393)

(alteration in original); *see also Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152

(1908).  Defendants do not argue that a federal question is presented on the face of Plaintiffs'

Amended Complaint, as the Amended Complaint brings claims exclusively under the NYSHRL

and NYLL.  Dkt. No. 1-1 ¶ 270.  Instead, Defendants emphasize that the EFAA states that

"whether this chapter applies with respect to a dispute shall be determined under Federal law."  9

---

[2] Notably, Defendants do not argue that any of the three "tightly circumscribed" exceptions to
the well-pleaded complaint rule apply here.  *Tong*, 83 F.4th at 133 ("They are: (1) if Congress
expressly provides, by statute, for removal of state-law claims; (2) if the state-law claims are
completely preempted by federal law; and (3) in certain cases if the vindication of a state-law
right necessarily turns on a question of federal law." (internal quotation marks omitted)).

U.S.C. § 402(b).  But Plaintiffs' argument, that the EFAA invalidates certain agreements Defendants invoke in their motion to compel arbitration, is insufficient to establish federal question jurisdiction over the entirety of Plaintiffs' suit.  To the contrary, the EFAA presents a mere defense to a defense here—a relationship far more attenuated to Plaintiffs' causes of action than the affirmative defenses that courts have long deemed inadequate to raise federal questions. *See Tong*, 83 F.4th at 132.  Because "arguments concern[ing] potential *defenses*" do not satisfy the well-pleaded complaint rule, *Feller v. Narragansett Indian Tribal Historic Pres. Off.*, 2016 WL 2733410, at *2 (D. Vt. May 10, 2016) (emphasis in original), the EFAA does not provide the Court with federal question jurisdiction over this case, *see Vaden v. Discover Bank*, 556 U.S. 49, 70 (2009) ("It does not suffice to show that a federal question lurks somewhere inside the parties' controversy.").

Defendants' second—and more substantial—contention is that the Court has diversity jurisdiction.  Dkt. No. 25 at 5.  Article III, section 2 of the Constitution states that the "judicial Power shall extend . . . to Controversies . . . between Citizens of different States."  U.S. Const. art. III, § 2.  However, "[f]ederal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Congress authorized courts to exercise diversity jurisdiction in section 1332(a) of Title 28 of the U.S. Code:  "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a).  Diversity jurisdiction requires "complete diversity," such that no adverse parties are citizens of

the same state.[3]  *Caterpillar Inc.*, 519 U.S. at 68; *see Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806).

Federal law permits defendants to remove cases that were originally filed in state court into federal court if they satisfy the requirements of diversity jurisdiction.  *See* 28 U.S.C. § 1441(a).  But "an 'action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 356 (2d Cir. 2011) (quoting 28 U.S.C. § 1441(b)).  "The right of removal is entirely a creature of statute and 'a suit commenced in a state court must remain there until cause is shown for its transfer under some act of Congress.'"  *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002) (quoting *Great N. R. Co. v. Alexander*, 246 U.S. 276, 280 (1918)); *see also Kokkonen*, 511 U.S. at 377 (explaining that federal jurisdiction cannot be "expanded by judicial decree").  Because the removal of a case from state to federal court implicates the delicate balance of federalism, "statutory procedures for removal are to be strictly construed."  *Syngenta Crop Prot.*, 537 U.S. at 32; *see also Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941) ("Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." (quoting *Healy v. Ratta*, 292 U.S. 263, 270 (1934))).

On its face, the Amended Complaint is ineligible for removal based on diversity jurisdiction under § 1441(a) because the parties are not completely diverse.  *See Grupo Dataflux*

---

[3] "An exception to this requirement of complete diversity is found within the Class Action Fairness Act, which extends diversity jurisdiction to cases in which 'any member of a class of plaintiffs is a citizen of a State different from any defendant.'"  *Hoosick Falls Assocs. v. Saint-Gobain Performance Plastics Corp.*, 2016 WL 9995519, at *3 (N.D.N.Y. Oct. 31, 2016) (quoting 28 U.S.C. § 1332(d)(2)(A)).

*v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 574 (2004).  All of the Plaintiffs are alleged to reside in New York.  Dkt. No. 1-1 ¶¶ 4–13.  Defendant Izquierdo also resides in New York.  *Id.* ¶ 15.  Thus, if the Court's review is limited to the face of the Amended Complaint, there are New York residents as both Plaintiffs and Defendant, so the parties are not completely diverse.

Defendants contend that the Court should nevertheless overlook the claims Alvarado, Arias, Henry, and Griffin bring against Izquierdo pursuant what has been termed the "fraudulent misjoinder" doctrine.  Dkt. No. 1 ¶ 37.  Where the doctrine is recognized, "[f]raudulent misjoinder may be found when 'a plaintiff purposefully attempts to defeat removal by joining together claims against two or more defendants where the presence of one would defeat removal and where in reality there is no sufficient factual nexus among the claims to satisfy the permissive joinder standard.'"  *Kips Bay Endoscopy Ctr., PLLC v. Travelers Indemn. Co.*, 2015 WL 4508739, at *6 (S.D.N.Y. July 24, 2015) (quoting *Sons of the Revolution in N.Y., Inc. v. Travelers Indemn. Co. of Am.*, 2014 WL 7004033, at *3 (S.D.N.Y. Dec. 11, 2014)).  The consequence is that the court severs the claims involving the non-diverse parties, remands them to state court, and "retain[s] jurisdiction over the diverse parties."  *Nasca v. ByteDance, Ltd.*, 2023 WL 5979210, at *8 (E.D.N.Y. July 27, 2023), *report and recommendation adopted*, 2023 WL 7102396 (E.D.N.Y. Oct. 27, 2023).

The fraudulent misjoinder doctrine was first recognized, or created, in the Eleventh Circuit's decision in *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), *abrogated on other grounds by Cohen v. Off. Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000).  In that opinion, the Eleventh Circuit reasoned that "[m]isjoinder may be just as fraudulent as the joinder of a resident defendant against whom a plaintiff has no possibility of a cause of action," and therefore held that joining non-diverse parties with "no real connection with the

controversy" to a suit, if sufficiently "egregious," constitutes fraudulent misjoinder.  *Id.*  Because

the plaintiffs in *Tapscott* joined two unrelated class actions, whose "only similarity" were

violations of the same Alabama consumer protection statute, the Eleventh Circuit affirmed the

district court's decision to "[d]isregard the citizenship of the improperly joined

parties, . . . assert[] jurisdiction and sever[] and remand[] the remainder of the action to state

court."  *Id.*

    Outside the Eleventh Circuit, the fraudulent misjoinder doctrine has garnered a mixed

reception.  The Eighth, Ninth, and Tenth Circuits have considered the doctrine without adopting

or rejecting it.  *See In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 622 (8th Cir. 2010) (holding

that, even if the doctrine were valid, "the plaintiffs' alleged misjoinder [was] not so egregious as

to constitute fraudulent misjoinder"); *Cal. Dump Truck Owners Ass'n v. Cummins Engine Co.*,

24 F. App'x 727, 730 (9th Cir. 2001) (rejecting the argument that "egregious misjoinder"

supported federal diversity jurisdiction because the joinder was not egregious and "the state

court, not the federal court, should decide whether there [wa]s a sufficient nexus" for the claims

to be joined); *Lafalier v. State Farm Fire & Cas. Co.*, 391 F. App'x 732, 739 (10th Cir. 2010)

("There may be many good reasons to adopt procedural misjoinder . . . [b]ut we need not decide

that issue today.").  However, the Fifth Circuit rejected fraudulent misjoinder, over the dissent of

Judge Jones, writing that adoption of the doctrine "would invite district courts to evaluate

procedural questions regarding misjoinder that are better resolved in state court prior to removal"

and that the doctrine is "a usurpation of the traditional ability of state courts to resolve procedural

questions central to the administration of their cases."  *Williams v. Homeland Ins. Co. of N.Y.*, 18

F.4th 806, 815–16 (5th Cir. 2021).  *But see id.* at 825–26 (Jones, J., dissenting) ("[T]he logic of

*Tapscott* makes sense where the basic aim of improper joinder analysis is to prevent parties from

manipulating their pleadings to deprive diverse defendants of the federal forum to which they are statutorily entitled.").

The Second Circuit has not yet addressed the fraudulent misjoinder doctrine, and district courts within the Circuit have taken varying approaches:  Some have rejected the doctrine outright.  *See Nasca*, 2023 WL 5979210, at *10; *V.V. v. Meta Platforms, Inc.*, 2023 WL 3613232, at *9 (D. Conn. May 24, 2023); *Labrecque v. Johnson & Johnson*, 2015 WL 5824724, at *3 (D. Conn. Oct. 2, 2015); *Mack v. Bayer Corp.*, 2007 WL 4333815, at *1 (D. Conn. Dec. 10, 2007).  The majority of courts, however, has neither accepted nor rejected fraudulent misjoinder as they have assumed the doctrine's viability yet ruled that it does not apply to the specific case at issue.  *See Abruzzo Docg Inc. v. Acceptance Indem. Ins. Co.*, 2021 WL 5304058 at *6 (E.D.N.Y. Nov. 15, 2021); *Massey v. Cecil*, 2019 WL 1780139, at *4 (N.D.N.Y. Apr. 23, 2019); *Kips Bay Endoscopy Ctr.*, 2015 WL 4508739, at *7; *Sons of the Revolution in N.Y.*, 2014 WL 7004033, at *4; *In re Fosamax Prod. Liab. Litig.*, 2008 WL 2940560, at *8 (S.D.N.Y. July 29, 2008); *A. Kraus & Son v. Benjamin Moore & Co.*, 2006 WL 1582193, at *6 (E.D.N.Y. June 7, 2006).  By contrast, only a handful of courts within the Second Circuit have exercised diversity jurisdiction on the basis of the fraudulent misjoinder doctrine.  *See Mancinone v. Allstate Ins. Co.*, 2020 WL 5709675, at *7 (D. Conn. Sept. 24, 2020) (applying the doctrine to claims that arose "from two separate series of transactions, occurring more than twenty-five years apart"); *In re Rezulin Prod. Liab. Litig.*, 168 F. Supp. 2d 136, 147–48 (S.D.N.Y. 2001).

The Court concludes that it has no authority to retain jurisdiction over this case on the grounds of fraudulent misjoinder and that, even if a court did have the authority to retain jurisdiction over a case involving non-diverse parties on grounds of fraudulent misjoinder, the Court would not exercise that authority here.  The *Tapscott* Court determined that courts had the

authority, and perhaps the responsibility, to retain jurisdiction over cases that did not satisfy the complete diversity requirement on grounds of "fraudulent misjoinder" by analogizing to the doctrine of fraudulent joinder.  77 F.3d at 1360.  But the equivalence is false, for more reasons than one.

The doctrine of fraudulent joinder permits the Court to "overlook the presence of a non-diverse defendant if from the pleadings there is no possibility that the claims against that defendant could be asserted in state court." *Bounds v. Pine Belt Mental Health Care Res.*, 593 F.3d 209, 215 (2d Cir. 2010) (quoting *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 302 (2d Cir. 2004)).  The doctrine "prevent[s] plaintiffs from joining non-diverse parties in an effort to defeat federal jurisdiction." *Briarpatch*, 373 F.3d at 302.  It derives from century-old case law from the Supreme Court holding that a defendant's "right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy . . . [whose joinder is] only a fraudulent device to prevent a removal." *Chesapeake & O. R. Co. v. Cockrell*, 232 U.S. 146, 152 (1914).  As the doctrine is currently understood, it applies only "[i]f there is no possibility a plaintiff can state a cause of action against a non-diverse defendant." *Soto v. Bushmaster Firearms Int'l, LLC*, 139 F. Supp. 3d 560, 562–63 (D. Conn. 2015).  In that circumstances, "it is objectively reasonable to infer that the plaintiff has engaged in a form of litigation abuse." *Id.* "Any possibility of recovery, even if slim, militates against a finding of fraudulent joinder; only where there is no possibility of recovery is such a finding warranted." *Ehrenreich v. Black*, 994 F. Supp. 2d 284, 289 (E.D.N.Y. 2014) (quoting *Nemazee v. Premier, Inc.*, 232 F. Supp. 2d 172, 178 (S.D.N.Y. 2002)); *see also Castillo v. BJ's Wholesale Club*, 645 F. Supp. 3d 85, 94–95 (E.D.N.Y. 2022) ("The district court's role in assessing fraudulent joinder is not to assess the *strength* of plaintiff's claims, but rather to assess

whether plaintiff *could* assert such a claim against the non-diverse defendants in state court." (emphasis in original)).  The consequence of fraudulent joinder is dismissal of the cause of action against the non-diverse defendant, such that the court "rest[s] jurisdiction only upon the citizenship of real parties to the controversy."[4]  *Vets N., Inc. v. Libutti*, 2003 WL 21542554, at *5 (E.D.N.Y. Jan. 24, 2003) (quoting *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980)). Accordingly, the case has the same complexion it would have had if it had remained in state court, where the claim against the non-diverse defendant would also have been subject to dismissal.  The fraudulent but otherwise disqualifying factor is simply disregarded—having been inserted only for the purpose of defeating federal jurisdiction and not for the purpose of obtaining any relief, it never was entitled to judicial recognition in the first place.  There is therefore no need to break a fraudulent joined case apart and no need to remand anything to state court.

So-called "fraudulent misjoinder" raises entirely different issues and presents entirely different problems.  *See In re Propecia (Finasteride) Prod. Liab. Litig.*, 2013 WL 3729570, at *3 (E.D.N.Y. May 17, 2013).  When a court is faced with a claim of "fraudulent misjoinder," it is not asked whether the claims that would defeat federal jurisdiction are fictive or are properly pled.  The presumption of the doctrine is that the claims are properly pled; they seek relief from properly named defendants based on a properly alleged claim.  *See id.*; *In re Prempro Prod.*

---

[4] That approach parallels the practice of dismissing cases that appear to present a federal question for lack of subject matter jurisdiction "where the alleged claim under the Constitution or federal statutes clearly [is] immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."  *Bell v. Hood*, 327 U.S. 678, 682–83 (1946).  Like fraudulent joinder, that doctrine requires more than merely "failing to state a claim for relief on the merits."  *Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 126 (2d Cir. 2016) (quoting *Shapiro v. McManus*, 577 U.S. 39, 45 (2015)).  Rather, the federal claim must be "essentially fictitious" for a court to disregard it.  *Id.* (quoting *Shapiro*, 577 U.S. at 45).

*Liab. Litig.*, 591 F.3d at 620.  Instead, the argument is that the claim that defeats federal jurisdiction should not have been joined with the claim that—were it pled alone—would have permitted federal jurisdiction.  *See Nasca*, 2023 WL 5979210, at *8.  But whether two claims are properly joined is, in the first instance and when the case originates, a question of state law, and not federal law.  *See Fed. Ins. Co. v. Tyco Int'l Ltd.*, 422 F. Supp. 2d 357, 381 (S.D.N.Y. 2006) ("[T]he question is one of joinder in the state action before it was removed."); *In re Fosamax Prod. Liab. Litig.*, 2008 WL 2940560, at *4 (S.D.N.Y. July 29, 2008).  And it is a question that often is not easily answered on the pleadings and at the time the case is removed.  Both parties here agree that when the case originated New York law governed the propriety of joinder.  Dkt. No. 14 at 11; Dkt. No. 25 at 10.  New York law permits "[p]ersons who assert any right to relief jointly, severally, or in the alternative arising out of the same transaction, occurrence, or series of transactions or occurrences, [to] join in one action as plaintiffs if any common question of law or fact would arise."  N.Y. C.P.L.R. § 1002(a); *see also id.* § 1002(b) (providing a similar standard for joinder of defendants).  That rule further clarifies that "[i]t shall not be necessary that each plaintiff be interested in obtaining, or each defendant be interested in defending against, all the relief demanded or as to every claim included in an action."  *Id.* § 1002(c).  The New York Court of Appeals has held that the "purpose" of the state's permissive joinder regime is "to lessen the delay and expense of litigation by permitting the claims of different plaintiffs to be decided in one action instead of many, when, although legally separate and distinct, they nevertheless so involve common questions, and spring out of identical or related transactions, that their common trial may be had with fairness to the different parties."  *Akely v. Kinnicutt*, 144 N.E. 682, 683–84 (N.Y. 1924).  Whether the federal courts would strike the same balance that New York strikes between efficiency and fairness is, or should be, irrelevant.  New York itself has the right to

determine for itself whether it will permit more than one plaintiff who asserts the same or similar claims to join together to sue a common defendant in a single lawsuit.

As this very case illustrates, the question whether two or more claims are properly joined for trial is not always readily determinable from the pleadings or at the case's outset.  On its face, the Amended Complaint brings claims that arise out of the same series of transactions or occurrences, suggesting "a *modus operandi* of discriminating against Plaintiffs."  *Gokdogan v. Slap Shot Pizza Enters. Ltd.*, 2021 WL 4441417, at *13 (E.D.N.Y. Sept. 27, 2021).  Under state law, "multiple transactions by multiple plaintiffs 'do not lose their character as a series of transactions because they occurred at different places and times extending through many months.'"  *Hempstead Gen. Hosp. v. Liberty Mut. Ins. Co.*, 521 N.Y.S.2d 469, 470 (2d Dep't 1987) (quoting *Akely*, 144 N.E. at 684); *see also Annunziato v. City of New York*, 647 N.Y.S.2d 850, 852 (2d Dep't 1996).  The Amended Complaint describes a common pattern of discrimination and harassment that "consisted of, among other things: daily use of the N-word and other derogatory comments . . . to describe Plaintiffs and their Black coworkers; [and] worse treatment than Hispanic workers in areas ranging from hiring and promotion opportunities to hours worked and compensation."  Dkt. No. 1-1 ¶ 272.  Based on Plaintiffs' pleading, their claims also appear to raise common questions of law and fact, including whether Sweetgreen—the common defendant across all of the Plaintiffs' claims—was aware of the alleged discrimination against its Black employees, and whether Sweetgreen took any actions either condemning or condoning that discrimination.  *See Castillo v. Isakov*, 2023 WL 6664552, at *7 (S.D.N.Y. Oct. 12, 2023).  Those factual matters will yield common legal questions, as a court must then decide if Sweetgreen's actions amounted to acquiescence or reasonable diligence.  *Zakrzewska v. New Sch.*, 928 N.E.2d 1035, 1039 (N.Y. 2010).  It may be that, as discovery

progresses and the case develops, the differences between the discrimination at one Sweetgreen's location and that at another become stark and the prejudice from joining the claims apparent such that severance is appropriate.  *See Iconix Brand Grp., Inc. v. Roc Nation Apparel Grp., LLC*, 2019 WL 5203256, at *2 (S.D.N.Y. Sept. 26, 2019) (Nathan, J.) ("If the factual record following discovery does not support Plaintiffs' allegations of coordination and joint ownership, Defendants may renew their motion [for severance] in advance of trial."); *United States v. Yonkers Bd. of Educ.*, 518 F. Supp. 191, 197 (S.D.N.Y. 1981).  But that is not a decision that can be made at the outset and from the pleadings.  *See LSH Co. v. Lincoln Nat'l Corp.*, 2019 WL 13380240, at *1 n.1 (E.D. Pa. May 10, 2019) ("Severing Plaintiffs' claims at this stage is premature.  Courts are reluctant to sever claims where discovery has not yet begun.").

Moreover, the doctrine of fraudulent misjoinder does offense to the autonomy that state courts rightfully enjoy in our federal system in a way that the doctrine of fraudulent joinder does not do.  The doctrine of fraudulent joinder does no offense to the states or their courts.  In determining whether allegations against a non-diverse defendant state a claim for relief under state law, the federal court applies the same law that the state court would apply.  *See MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 393 (S.D.N.Y. 2009) ("[T]he test of whether or not there has been fraudulent joinder is uniformly whether the plaintiff can establish a claim under state, not federal law." (quoting *Fed. Ins. Co.*, 422 F. Supp. 2d at 378)); *see also Battaglia v. Shore Parkway Owner LLC*, 249 F. Supp. 3d 668, 671 (E.D.N.Y. 2017).  In theory, the law is indifferent to the forum.  By contrast, the doctrine of fraudulent misjoinder asks the federal court to make a judgment that is paradigmatically for the state courts to make.  Whether to permit persons who file lawsuits in state courts to join or sever claims involves discretionary determinations about how courts should efficiently manage their own dockets.  *See Briarpatch*

*Ltd., L.P. v. Pate*, 81 F. Supp. 2d 509, 515 (S.D.N.Y. 2000).  The answer to that question is not always clear and a federal court, with its own concerns over efficiency and docket management as well as its own rules of procedure, might not always answer it in the same way a state court would.  As a result, a federal court applying the doctrine of fraudulent misjoinder might divide in two a case that the state court would have allowed to remain as one.  That decision is of consequence.  It is axiomatic that plaintiffs "are the masters of their complaints." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013).  A party's choice to join a fellow plaintiff in bringing suit is meaningful.  Combining the claims of separate individuals into a single complaint is an expression of "solidarity" and an acknowledgement that their rights are intertwined.  Lawrence C. George, *Sweet Uses of Adversity:* Parklane Hosiery *and the Collateral Class Action*, 32 Stan. L. Rev. 655, 686 n.131 (1980).  Moreover, the joinder of multiple plaintiffs can reduce litigation costs, enabling those with otherwise-infeasible claims to have their day in court.  *See Garcia v. City of Newport Beach*, 2020 WL 6431898, at *2 (C.D. Cal. Apr. 24, 2020) ("[J]oinder promotes judicial economy, convenience to the parties and witnesses whose testimony and evidence may be overlapping and duplicative, as well as cost savings in not having to try two or more cases.").  It is one thing for the state court before which a lawsuit is initially filed to decide that the efficiencies of permitting parties to join forces are outweighed by the prejudice and unfairness to the other side.  It is another thing entirely for a federal court in which the plaintiff did not sue and which does not ordinarily apply state procedural law to make that decision for the parties.  *See V.V.*, 2023 WL 3613232, at *8 ("State procedural law, however, is almost never the subject of federal court determination, so the application of a state's procedural rule for fraudulent misjoinder purposes is an uncommon task for a federal court." (quotation omitted)).  Federal courts should be loath to make those decisions on state courts'

22

behalf.  Such "second guessing" not only undermines federal-state "comity," *Farbotko v. Clinton Cnty., NY*, 168 F. Supp. 2d 31, 39 n.8 (N.D.N.Y. 2001), but also violates the "hallmark of federalism that a federal court sitting in diversity, while using its own rules to govern procedural matters, will apply the substantive law of the forum state," *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1011 (2d Cir. 1995), *vacated on other grounds*, 518 U.S. 1031 (1996).

The doctrine of fraudulent misjoinder requires courts to make decisions early in the litigation and on the pleadings that rightfully should be made only as the case develops.  The doctrine of fraudulent joinder requires the court only to "scrutinize a plaintiff's pleadings," *Durove v. Fabian Transp., Inc.*, 2004 WL 2912891, at *2 (S.D.N.Y. Dec. 14, 2004); *MBIA Ins. Corp.*., 706 F. Supp. 2d at 388, and assess whether "state case law or legislation removes all reasonable possibility that the plaintiff would be permitted to litigate the claim," *DNJ Logistic Grp., Inc. v. DHL Exp. (USA), Inc.*, 727 F. Supp. 2d 160, 165 (E.D.N.Y. 2010) (quoting *Kuperstein v. Hoffman–Laroche, Inc.*, 457 F. Supp. 2d 467, 471 (S.D.N.Y. 2006)).  The federal court engages in a similar exercise to that it would engage in at the beginning of a litigation if the lawsuit was filed originally in federal court: it tests the allegations of the complaint to see whether there is any possibility they would state a claim for relief.  *See Soto*, 139 F. Supp. 3d at 563; *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007).  Because the fraudulent joinder doctrine requires courts merely to determine "whether Plaintiffs have a possibility of asserting [their] claims," *MBIA Ins. Corp.*, 706 F. Supp. 2d at 388, courts need not imagine how litigation might unfold.  Additionally, "the Second Circuit's 'no possibility' standard is a high one," *Castillo*, 645 F. Supp. 3d at 95; *see Pampillonia*, 138 F.3d at 461, so the cases that satisfy it are both rare and flagrant, *see Gallagher v. Boehringer Ingelheim Pharms., Inc.*, 2023 WL 402191, at *6 (S.D.N.Y. Jan. 25, 2023)

(finding Pfizer was fraudulently joined when "there [was] no allegation that Pfizer had anything to do with the product that was sold to Plaintiff").  Fraudulent joinder's simplicity—in comparison to the uncertain predictions underlying fraudulent misjoinder—respects the principle that "[j]urisdictional rules should be clear."  *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 14 (2015).

By contrast, the doctrine of fraudulent misjoinder would have the Court engage in a "novel," *V.V.*, 2023 WL 3613232, and unfamiliar exercise, and one certain to breed uncertainty. Federal Rule of Civil Procedure 21 permits a court to sever a claim or party "at any time."  Fed. R. Civ. P. 21.  Federal Rule of Civil Procedure 42(b) allows a court to order a separate trial of one or more separate issues "[f]or convenience, to avoid prejudice, or to expedite and economize."  Fed. R. Civ. P. 42(b).  As those rules reflect, the propriety of joinder depends on dynamic factors that evolve over the course of litigation.  Treatment that appears common in a complaint may prove divergent after discovery, such that what once seemed to be a series of transactions is revealed to be nothing more than a collection of discrete acts.  *See Iconix Brand Grp.*, 2019 WL 5203256, at *2.  Likewise, the shared legal questions a court anticipates based on a pleading may not come to fruition if the underlying facts differ from the plaintiff's allegations. *See Gokdogan*, 2021 WL 4441417, at *14, *16.  Lurid evidence as to one plaintiff's claim could also result in significant prejudice if her co-plaintiffs' causes of action ultimately depend on less vivid conduct.  *See People of State of N.Y. ex rel. Spitzer v. Operation Rescue Nat.*, 69 F. Supp. 2d 408, 419 (W.D.N.Y. 1999).  Consequently, a court scrutinizing a pleading pursuant to the fraudulent misjoinder doctrine cannot reliably predict whether joinder will promote the overriding purpose of permissive joinder: the efficient resolution of related claims.  *See Akely*, 144 N.E. at 683.  A doctrine that would have the court determine joinder at the outset, and from the pleadings alone, therefore risks one of two unpalatable results—either it is applied so

infrequently as to become almost meaningless or it requires a court to make precipitous judgments when greater experience with a case and its facts would lead to the wiser and fairer exercise of discretion.  The fraudulent misjoinder doctrine's inherent uncertainty carries concrete costs.  As the parties' removal dispute here demonstrates, "[c]omplex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims."  *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).  And because "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists," the fraudulent misjoinder doctrine casts a shadow over every case removed on the basis of diversity jurisdiction.  *Id.*  Thus, "greater predictability" is yet another virtue of fraudulent joinder that fraudulent misjoinder sorely lacks.  *Id.*

Fraudulent misjoinder's novel approach also sits uneasily with the text of the removal statute.  Under Section 1447(c), "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).  That provision is binary: a court either remands "the case" or not.  The fraudulent joinder doctrine is consistent with the language of the statute.  Because the non-diverse defendant was added only for the naked and transparent purpose of defeating federal jurisdiction, his or her presence was only fictive.  *See A. Kraus & Son*, 2006 WL 1582193, at *4.  It is as if the plaintiff added a person who did not exist.  The doctrine of fraudulent misjoinder would have the federal court, after ruling on a motion to remand, exercise an entirely different power.  It would require a court that has no "power to hear a case," *Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 81 (2009), to divide the plaintiff's pleadings in two[5] and then remand not the "case" that was improperly removed but an entirely

---

[5] Federal Rule of Civil Procedure 21 authorizes a court to "[o]n motion or on its own . . . at any

different case, comprised of only some of the parties and some of the claims from the original

dispute.  The federal statute permits the remand of "cases."  On its face, it does not permit the

remand of claims.[6]

Ultimately, fraudulent joinder and fraudulent misjoinder differ in the most fundamental

of respects: their justifications.  The doctrine of fraudulent joinder serves the notion that no

person has the right to employ "a fraudulent device" to defeat an act of Congress.  *Chesapeake &*

*O. R. Co.*, 232 U.S. at 153.  It applies when a person is added as a defendant not to obtain relief

or because a genuine claim, but rather for the sole and naked purpose of defeating a right granted

by Congress, *i.e.*, the right of removal.  *See Wecker v. Nat'l Enameling & Stamping Co.*, 204

U.S. 176, 185–86 (1907).  The logic that permits a court to disregard the fictive defendant and to

reject an argument for remand based on pretense does not extend to the circumstance where all

---

time, on just terms, add or drop a party.  The court may also sever any claim against a party."
Fed. R. Civ. P. 21.  But invoking Rule 21 to justify fraudulent misjoinder "puts the cart before
the horse: as with all federal rules, [Rule 21] applies *after* a federal court has jurisdiction."
*Williams*, 18 F.4th at 817 (emphasis in original); *see also* Fed. R. Civ. P. 82 ("These rules do not
extend . . . the jurisdiction of the district court.").

[6] The removal statute provides that "[a] civil action otherwise removable solely on the basis of
the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in
interest *properly joined* and served as defendants is a citizen of the State in which such action is
brought."  28 U.S.C. § 1441(b)(2) (emphasis added).  The reference to a defendant who is
"properly joined and served" simply ensures that "Section 1441(b)(2) is inapplicable until a
home-state defendant has been served in accordance with state law; until then, a state court
lawsuit is removable under Section 1441(a) so long as a federal district court can assume
jurisdiction over the action."  *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir.
2019).  That phrase lends no support to the fraudulent misjoinder theory.  To conclude otherwise
ignores section 1441(b)(2)'s narrow purpose: to prevent lawsuits that are "otherwise removable"
due to diversity jurisdiction from being litigated in the federal courts of a defendant's home state.
*See Confer v. Bristol-Myers Squibb Co.*, 61 F. Supp. 3d 305, 306 (S.D.N.Y. 2014) ("[T]he
defendant who lives in the state where the action is brought has no prima facie reason to fear
local prejudice or discrimination against out-of-towners, and thus to seek the protection of
federal diversity jurisdiction.").  Indeed, Section 1441(b)(2) applies only if complete diversity
already exists, *i.e.*, if the action is "otherwise removable."  28 U.S.C. § 1441(b)(2); *see Williams*,
18 F.4th at 815.  That provision therefore cannot be read to establish a test for whether the action
is "removable" in the first place.

of the defendants are properly named and the only issue is whether the claims are properly

joined.  In those circumstances, each claim is presumptively meritorious; the fraudulent

misjoinder doctrine assumes that the allegations state a claim for relief.  *See In re Propecia*

*(Finasteride) Prod. Liab. Litig.*, 2013 WL 3729570, at *4.  If they were not, then the doctrine of

fraudulent *joinder* might apply.  And, because the plaintiff who has joined the claims will be

forced to prosecute and try the claims together, the decision to join them presumably is based not

on a naked and fraudulent interest in defeating a removal notice that may never be made, but

rather on the strategic judgment of counsel that the case can be efficiently and successfully tried

with the claims united instead of separated.  The doctrine of fraudulent misjoinder does not

recognize and disregard an artifice by the plaintiff to defeat federal jurisdiction.  To the contrary,

recognition of the doctrine would permit an artful defendant to defeat *both* plaintiff's choice of

forum and plaintiff's choice of claims and parties all early in the case and in one fell swoop.

A defendant who believes that two claims have been joined improperly for the purpose of

defeating federal jurisdiction or, even if not joined for a fraudulent purpose, that the two claims

will not survive in a single complaint, is not without recourse.  She can still "seek severance in

state court, which would render the propriety of subsequent removal to federal court

straightforward." *V.V.*, 2023 WL 3613232, at *6; *accord Williams*, 18 F.4th at 815 n.12 ("[A]

defendant contemplating removal can (and should) ask the state court to resolve party misjoinder

questions and then remove."); *In re Prempro Prod. Liab. Litig.*, 591 F.3d at 624 n.8; *Cal. Dump*

*Truck Owners Ass'n*, 24 F. App'x at 730.  And she can do so without worrying about the thirty-

day deadline for removing a case to federal court under section 1446(b) of Title 28 of the U.S.

Code.  That timeframe resets when a defendant receives "a copy of an amended pleading,

motion, order or other paper from which it may first be ascertained that the case is one which is

or has become removable." 28 U.S.C. § 1446(b)(3). A state court's "order" severing a case's non-diverse defendants would satisfy that provision. *See Williams*, 18 F.4th at 817; 14C Charles Alan Wright et al., *Federal Practice and Procedure* § 3723.1 (rev. 4th ed. 2023). Even if the facts that establish that two claims were fraudulently joined only emerge late in a case, the defendant can still pursue removal. The one-year limit for removing a case under section 1446(c)(1) is not absolute, as it does not apply if "the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." 28 U.S.C. § 1446(c)(1); *see Nocelli v. Kaiser Gypsum Co., Inc.*, 2020 WL 230890, at *2 (S.D.N.Y. Jan. 15, 2020). What the defendants may not do, however, is eschew a state court decision on whether the claims are properly joined by asking the federal court to make that decision in the first instance.

In sum, the Court concludes that the doctrine of fraudulent misjoinder is an unauthorized expansion of federal diversity jurisdiction and an imprudent departure from the well-established rules of fraudulent joinder. But even if fraudulent misjoinder were a valid basis for diversity jurisdiction, Defendants have not shown that Plaintiffs' joinder here was improper under N.Y. C.P.L.R. Section 1002. Thus, the parties are not completely diverse and the Court must grant Plaintiffs' motion to remand.

## CONCLUSION

Plaintiffs' motion to remand this lawsuit to the Supreme Court of the State of New York, Bronx County, Dkt. No. 13, is GRANTED.  Defendants' motion to compel arbitration and dismiss the Amended Complaint, Dkt. No. 5, is DENIED as moot.

The Clerk of Court is respectfully directed to terminate all motions and deadlines, close the case, and transfer it back to the Supreme Court of the State of New York, Bronx County.

SO ORDERED.

Dated: January 17, 2024
     New York, New York

                                       LEWIS J. LIMAN
                                    United States District Judge